IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JANE DOE, | Case No: |
| Plaintiff, | |
| v. | |
| COURT OF COMMON PLEAS OF BUTLER COUNTY, 50th JUDICIAL DISTRICT; THOMAS DOERR, individually; THOMAS HOLMAN, individually; and DOUGLAS RITSON, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## COMPLAINT

Plaintiff, Jane Doe, by and through her attorney, Edward A. Olds, Esq., and Olds Russ Saenz Marquette & Peace, hereby files the following Complaint against Defendants as captioned above.

### I. JURISDICTION AND VENUE

1. This Court has jurisdiction over this matter by virtue of 28 U.S.C. §1331 and 42 U.S.C. § 2000e. Doe brings a discrimination action and a civil rights action against the Defendants arising out of their discriminatory treatment of her.

### II. PARTIES

2. Plaintiff, Jane Doe, is an adult individual who resides in Butler County, Western District of Pennsylvania.

3. Defendant, Court of Common Pleas of Butler County, 50th Judicial District, (Court) is part of the Pennsylvania Unified Judicial System.

4. Defendant, Thomas Doerr, is the President Judge of the Court of Common Pleas of Butler County. He is sued in his individual capacity by virtue of his possessing the final

1

administrative authority over the employment practices of the Court of Common Pleas of Butler County, including over the Court's Probation Office.

5. Defendant, Thomas Holman, is the Court Administrator of the Court of Common Pleas of Butler County, and has supervisory authority over the Probation Office and the Domestic Relations Office of the Court of Common Pleas of Butler County.

6. Defendant, Douglas Ritson, is the Chief Probation Officer of the Court of Common Pleas of Butler County.

7. These Defendants are sued in their individual capacity. However, by virtue of their position with the Court of Common Pleas of Butler County, they all act under color of state law. The claims brought by Doe arose out of acts committed by the individual Defendants in the course performing their administrative duties to the Court.

### III. FACTS

8. Doe works as a Probation Officer for the Court of Common Pleas of Butler County. She has worked for the Court since August of 2005.

9. Doe met Thomas Doerr at a Christmas party at the house of the Chief Public Defender for Butler County in December of 2004.

10. At the time, Doe was working in the Probation Office for the Court of Common Pleas of Allegheny County. However, she was a life-long Butler resident and was interested in returning to Butler.

11. At the Christmas party she networked with Doerr. At that time, Doerr, as Chief Judge of the Court of Common Pleas of Butler County, had supervisory and ultimate authority over the operation of the Court. Included within this authority would be the authority to either hire or recommend hiring probation officers.

12. Doerr immediately expressed an interest in establishing a social relationship with Doe. He shared his cell phone number, induced her to give him her cell phone number and suggested that they maintain contact. They had discussed their views of probation work, and Doerr suggested that he thought Doe had a sound view of the purposes of probation. Doerr also engaged in flirtatious behavior. He told Doe that he thought she was very attractive and suggested that they continue to meet.

13. In fact, Doerr was interested in establishing a romantic or sexual relationship with Doe. He thereafter called her cell phone a number of times, always insisting that they meet. He repeatedly invited her to visit him or meet him. At first Doe put him off and looked for excuses not to meet with him.

14. Doerr eventually convinced Doe to come to his chambers late on a Friday evening in February 2005. Doe had undergone an endoscopy that particular morning, during which procedure she was given anesthesia that day, and was not supposed to drive. Nevertheless, Doerr reassured her that she could drive and insistently summoned her to visit with him. She succumbed and when she arrived, he let her in the courthouse door. They were alone in the courthouse that evening. Doerr was also insistent that they engage in sexual intercourse that evening, and though Doe did not share his enthusiasm, she allowed him to engage in sexual intercourse with her on the chambers' floor. The encounter was not romantic, nor was Doe avid about engaging in sexual intercourse. She nevertheless allowed him to penetrate her and have consummation. That evening Doerr stated that it would be a "business" relationship, and advised Doe not to develop any attraction for him. Doe left the courthouse sickened.

15. The prospect that Doe would be hired to serve as a probation officer in Butler County was implicit, and in fact, discussed that evening. Doerr suggested that he would do what he could to help Doe get a job with the probation office.

16. In fact, over the next several months, Doerr and the Court administrator at the time, Michael Noyes, maintained contact with Doe about a position as a Court probation officer. Doe did not engage in any further sexual activity with Doerr before she was hired.

17. A vacancy in the probation office occurred later in the summer. Doerr took complete control and ensured Doe was hired. Doe was given the position and sworn in as a probation officer in August of 2005. She was assigned to adult probation.

18. Once she began her work for the Butler County Court of Common Pleas, Doerr began again, to summon her to his chambers for sexual relations. Doe felt that she had little choice and did not resist his command. The sexual relations resumed, and there were a number of instances over the next four years when Doe would be summoned by Doerr to come to his office, after hours or on weekends, for the purpose of sexual intercourse.

19. The affair between Doerr and Doe continued for approximately four years after she was hired. The instances of sexual encounters dwindled over time. There was never romance in the affair. The best that can be said from Doe perspective is that she tolerated the sexual encounters. She felt that she had no choice, given the power disparity; therefore, she succumbed. It continued, in the words of Doerr, to be a business transaction and brought Doe no joy or satisfaction.

20. In addition to sexual encounters, Doerr shared pornographic images with Doe and others. On one occasion, he telephoned her told her he had been on the bench, and

asked her to transmit a video of herself masturbating. She declined but found a pornographic show on cable television, which she transmitted to him. There was widespread sharing of pornography among Court employees, including Doerr. At some point, Doerr directed that the email archives be deleted.

21. Eventually, Doe decided to terminate the affair, and the sexual encounters ceased. But the consequences of the affair have persisted to this day.

22. Many in the Probation Office of Butler County, viewed Doerr's hiring of Doe suspiciously. Doerr's actions and the fact that Doe had access to Doerr outside the typical lines of authority and reporting caused Holman and Ritson to develop resentment, antipathy and anger towards Doe. It is believed that they knew of or suspected the nature of Doerr's relationship with Doe.

23. Consequently, the senior management, including Holman, were always on edge when it came to Doe and treated her differently. The attitude of these individuals manifested itself in petty matters, but due to the persistence of the negative attitude, the treatment caused Doe great stress.

24. After Doe ended the sexual relationship with Doerr, Doerr continued to try to influence her life and be a part of her life. He has insisted that they display "normal" social interacting, and Doe puts on a show, when she encounters him, of social affection, knowing that her failure to do so might result in retribution. However, in 2010, Doe started dating her current husband, who was also a Probation Officer. After this, tensions emanating from Doerr contributed to problems Doe faced in the work place. Doerr became antagonistic. On one occasion he ran into Doe and her future husband at

a Lowes store, and remarked that he hoped they were off the clock. In fact, they were. But he was clearly upset by their being together.

25. There was also pushback from the Probation Office supervision, directed at both Doe and her future husband.

26. On the other hand, Doerr felt it necessary to continue to control Doe to make sure she never revealed their relationship. For instance, he encouraged Doe to engage with his wife in a sideline, selling Silpada Jewelry at parties, and thus compromise her independence.

27. Doe eventually married her current husband, and both of them were subjected to harassment at the hands of Ritson and Holman. Doe's current husband had worked at the Probation Office for over twenty years prior to marrying Doe, and the fact that he became a target of harassment is indicative of the resentment held for Doe, which had shadowed her career at the Court, and continued even after she broke up her relationship with Doerr. The hostile conduct directed towards William Doe caused him to develop anxiety and seek time off from work. He eventually retired after an extended paid leave. This arrangement was supervised and approved by Doerr.

28. Doe became pregnant in 2012, and developed heightened risks factors that were known to both Doerr and Ritson. She had to leave work early in the pregnancy, because of a situation that almost resulted in a miscarriage. She continued to have problems throughout the pregnancy. Her job had been supervising probationers at the time of their reentry. However, about 4-6 weeks before she was scheduled to go on leave to deliver, her caseload was given to another officer and she was reassigned to a general caseload, supervising 190 probationers.

29. This transfer, engineered by Ritson, followed upon Doe and her husband registering a complaint about certain PO's who authored and performed a rap song, parodying the PO's office and the PO office clientele and portraying the probation process in a totally embarrassing light. The offending officers were favorites of Ritson. Doe's reassignment was punitive and made effective on the eve of her pregnancy leave.

30. Ritson told her that the judges were unhappy with her use of a standardized order, although no judge had ever complained or suggested that Doe use a different order. Shortly before the transfer, Doerr had told Doe that her performance was viewed as excellent by the other judges.

31. Doe began her pregnancy leave in September of 2012. While on leave, she was advised that when she returned, she would be reassigned once again, this time, moving from Adult Probation to Juvenile Probation. This was an absolutely involuntary reassignment. As a Juvenile Probation Officer, Doe would be required to appear in front of Judge Doerr, as he handled family and juvenile matters. A new position was actually created - - the Placement Officer position - - which would require extensive travel, visiting juveniles in placement throughout the Commonwealth.

32. The reassignment to the Juvenile section was imposed over Doe's objections. First, she did not want to be exposed to frequent contact with Doerr. Second, the extensive travel required of the position was very difficult for her given the fact that she had a new infant who had health problems associated with a heart malfunction. Doe questioned Doerr about the move, and he told her it was meant to get her out of the adult probation "hornet's nest" and to move her closer to him.

33. By virtue of Doe's new assignment to Juvenile court, Doerr was able to essentially force frequent interaction with Doe, as she had to appear in his Courtroom. She had had enough of Doerr, and was not happy about his pretense at having a social relationship with her, which took the form of overly affectatious, unctuous greetings when he saw her in his courtroom, as exemplified by his loudly announcing her presence in court, or by coyly waving at her from behind his computer while he sat on the bench. Doerr was either trying to reignite their relationship or emphasizing his power over her by these demonstrations. It caused Doe tremendous social and emotional agony and anxiety to have these frequent encounters with Doerr.

34. Doe's work situation continued to be fraught with harassment, micromanagement, and interference with the way she performed her job. That hostility, coupled with the fact that her assignment to Juvenile Division required her to maintain contact with Doerr, prompted her to decide in early 2014 that she simply could not continue working in the probation office. She talked to Doerr about her decision and he arranged to have her transferred the Butler County Domestic Relations Office.

35. This move involved a significant pay reduction - - $12,000 per year - - and Doe quickly regretted leaving the probation position. She rethought the decision that led to her giving up her probation position, and, in a matter of a few days, advised that she wished to return to the Probation Office.

36. This should have been a simple process. Butler County personnel policies allow for an employee to return to their former position, if they elect to do so within 30 days, and Doe believed that she could return to the probation office as a matter of right, since she made her decision within that time frame.

37. However, Doerr and Holman stymied her return. She met with Holman, and he told her that Doerr in particular would not allow her to return. "The marriage was over," according to Holman, and she would "have to sue the Judge" to get her old job back. Doe happened to encounter Doerr in a stairwell of the courthouse at this time and he grabbed her hand, while she discussed her desire to return to her probation officer position.

38. Doerr, in the end, decided to use the occasion to secure a release from Doe. He would allow Doe to have her job, but he insisted that before Doe could return to a Probation Office position, she would have to sign a general release. He had his counsel, supplied by the Administrative Office of the Pennsylvania Courts, negotiate the release. Presumably, that counsel did not know the underlying unstated harm Doerr wanted to put to rest. The release was deliberately crafted to relieve Doerr of any liability for the historical treatment of Doe. During the course of negotiations, a mutual acquaintance of Doe and Doerr, who was also an employee of Butler County, asked Doe to lunch and told her that Doerr was his man, and that he would "kill her" if she disclosed her relationship with Doerr.

39. Doe did not know how to take the comment, not believing that the acquaintance actually would carry through with violence, but she was highly upset and had to call her husband immediately after the encounter to talk to him about it. She was put at great unease by virtue of the conversation.

40. Doe did sign the release and was returned to the Probation Office. The release had assurances that Doe would be treated similarly to other probation officers, a promise that was not kept.

41. Doe was placed as a Probation Officer in Domestic Relations, responsible for probation issues in family court. In the past, this function had been staffed by males, who not only supervised defendants who had pled guilty to indirect criminal contempt, because they had violated PFA orders, but also defendants convicted of other domestic violence offenses, such as simple assault. This position therefore fell under the gambit of adult probation. Once Doe was placed into the position, however, her expense reimbursements come from the juvenile probation account, as if she is still slotted as a juvenile probation officer. The Juvenile Probation Unit, has been short an officer for the past four years.

42. From the outset of her placement in the domestic relations position, Doe was isolated, ostracized and treated differently. She was denied her own office. She was forced to work in an open area, even though she was handling confidential matters. She was isolated from other probation officers. Emails of general circulation were not provided to her. She was treated as a second-class citizen when it came to training opportunities, even though she is relatively high on the seniority list. She was given a different allotment of uniforms, and a variety of other instances of dissimilar treatment. Her direct supervisor is not a probation officer, and has essentially no experience in dealing with people on probation.

43. In one instance, after qualifying at the firing range with a satisfactory score, she was falsely accused, two weeks later, of being unsafe on the range and told that she would have to re-qualify. She was forbidden to carry a firearm, in the meantime. She was forced to re-qualify on short notice on a frigid day. On another occasion, she was forced to qualify standing next to Ritson. This arrangement was deliberate, as Ritson knew she

was nervous to be in his presence, because of his animosity towards her. Doe even went to Holman in this instance, begging not to be placed next to Ritson. Holman refused her request, and Doe and Ritson spent the entire day on the range, handling loaded firearms, next to each other.

44. Doe was also restricted in terms of performing her probation duties and not allowed to go out and conduct field visits of her probation reports.

45. The mistreatment of Doe persisted through 2014 and 2015, and eventually Doe began an investigation to substantiate her belief that she was being singled out. She presented a number of right to know requests to determine what probation officers were being awarded overtime.

46. At the end of 2015, Doe submitted her application for on-call duty. On-call duty is the opportunity to be on call 24/7 for a one-week period to handle urgent or emergency matters that occur during off-hours.

47. Holman, Doerr and Ritson rejected her application. This action, along with the information that Doe had learned by submitting right to know requests, prompted Doe to decide that she was a subject of discrimination and retaliation. Doerr had his hands in the denials, and continued to exert his influence over her day-to-day work situation.

48. Doe decided to contact the Equal Employment Opportunity Commission and indicate her intent to file a Charge of Discrimination in February 2016.

49. Doe advised her supervisors of her intent at the end of February 2016.

50. Within days, Doe was placed on a Performance Improvement Plan. Doe's supervisors told her that Doerr and Holman were behind the move. The performance plan was absurd, focusing on picayune issues. This reaction was in retaliation for Doe having

contacted the EEOC, as Doe had received a good evaluation at the end of January 2016. No performance problems were noted.

51. In addition, Doe's request for on-call duty/standby time was denied, even though the on-call benefit is open to all probation officers.

52. Subsequent to Doe notifying the Court that she had filed an EEOC complaint, Holman and Doerr concocted a policy that purported to preclude probation officers assigned to the Domestic Relations Office from being eligible for on-call duty. Presumably, they intended to use this as evidence to defeat Doe's discrimination claims.

53. The document was fabricated and clumsily backdated and made to appear as if it had been in effect since 2013. In fact, there had been no such policy that predated Doe's filing with the EEOC. The employee handbook issued in 2013 ineluctably attests to this fact.

54. The intent of Holman and Doerr in concocting the faux policy and creating, what is in essence false evidence, was to retroactively attempt to justify the refusal to permit Doe to do on-call duty. They wanted to have some "legitimate" reason for the Court's actions.

55. Holman and Doerr sought specifically to deny Doe equal protection of law in crafting the policy.

56. Doe has continued to be singled out and treated differently, even after she presented her claim to the EEOC. She is still not on the general email list, she continued to be prohibited from performing fieldwork, and even now, when she does, Ritson designates her a partner, who is invariably a male. Ritson insists that Doe be accompanied by two males from Adult Probation. The other PO in the Domestic Relations Unit may choose

his partner, and make house calls on probationers in the evening, which involves overtime.

57. She has been treated in this fashion, and in essence punished, due to her ending the relationship with Doerr and filing a charge of discrimination.

58. There has never been a respite for Doe - - from the time she terminated her relationship with Doerr until the present - - from the attention, attempts to control, and menace of Doerr. Doe must face each day, not knowing what Doerr will do. His manipulation of her feelings and emotions constitutes an ongoing, continuing quid pro quo hostile work environment.

## IV. CAUSES OF ACTION

### COUNT I

### Doe v. Court of Common Pleas of Butler County

### Claim Under Title VII; 42 U.S.C. §2000(e)

59. The preceding paragraphs are incorporated herein as if set forth in full.

60. Doe filed charges of discrimination and provided information to the Equal Opportunity Commission ("EEOC") in a timely fashion.

61. In her charge, Doe related the manner in which she had been subject to discrimination by the management of the Court of Common Pleas of Butler County, including Holman, Ritson and Doerr.

62. Doe has provided the EEOC with additional information over time, setting forth the basis for her belief that she is a victim of quid pro quo discrimination and retaliation.

63. The EEOC has issued a Right To Sue Letter and Doe is filing this timely Complaint in accordance with her rights.

64. Doe has satisfied all of the procedural and administrative requisites for maintaining this action against the Court.

65. As a result of the conduct of the Defendant Court of Common Pleas of Butler County and its agents, Doe suffered great injury both personal and financial.

66. Doe requests this Court assume jurisdiction over this matter, and adjudicate her rights under Title VII.

## COUNT II

### Doe v. Doerr

**Claim under 42 USC Section 1983--Violation of the Equal Protection and Procedural Due Process Clause of the Fourteenth Amendment and the Rights Guarantied under the First Amendment to the Constitution including the Right to Engage in Expressive Activity and to have Access to Courts or Petition the Government as well as Right to not associate with Doerr in an Intimate Fashion as Guarantied by the First Amendment**

67. The preceding paragraphs are incorporated herein as if set forth in full.

68. Although Doe ended the sexual relationship with Doerr almost eight years ago, Doerr has continued to exert influence on Doe's life. He has attempted to control her and cajole her into maintaining a social relationship with him, in spite of her desire to end the relationship with him.

69. Over the course of years, Doerr has abused his power and authority over Doe and has attempted to force friendship, companionship, and social interactions upon Doe, which are offensive and unwanted, and which have caused her great injury.

70. Doerr's transfer of Doe to the Juvenile Division, so that she would be forced to appear in his courtroom is a reflection of his efforts to control and influence her life and his continued efforts to force himself upon her. He forced her to appear in his courtroom, and by creating that proximity, he placed himself in the position of monitoring her,

extracting social responses from her and continually reminding her of their past relationship, and his power over her life.

71. Doerr manipulated the rules and policies of Butler County and the Court to coerce Doe into providing a release that purportedly shielded him from any claims that she might have had against him, under the guise of negotiating her return to the Probation Office.

72. He has continued attempt to control Doe to assure that she would never disclose their relationship, which had not been proper, and which involved his violating the Rules of Judicial Conduct.  Doerr has insisted that Doe maintain appearances of a professional/social relationship with him.  Doe has felt compelled to observe a propinquity, for fear that her failure to do so will anger Doerr.

73. Moreover, Doerr has set down rules, practices and procedures in the Court of Common Pleas of Butler County that have essentially prevented Doe from performing her duties and enjoying all of the benefits and rights she might have as a Probation Officer.

74. In 2016, he, along with Thomas Holman, manufactured a purported policy, after Doe filed a charge of discrimination against the Court with the EEOC, in order to deny her justice and with the purpose of corrupting the EEOC's investigation of her charge.

75. Doerr condoned, and in fact, fostered the continuing discrimination of Doe by the administrative personnel of the Court of Butler County, including Holman and Ritson which has resulted in Doe essentially being a second class probation officer, excluded from training opportunities, isolated from other officers and deprived of the opportunity to perform her job duties to the best of her ability.

76. Doerr's conduct has essentially been continuous, since the point when Doe broke off her relationship with him, and purposed to maintain his power and control over her.

77. Doerr's actions have caused Doe great embarrassment, humiliation, and other personal and emotional injuries.

78. Doerr's treatment of Doe has violated her rights under 42 U.S.C. § 1983, as it violates her rights under the Fourteenth Amendment to the United States Constitution to be free from unequal treatment at the hands of state officials; has resulted in a denial of procedural due process; and has violated rights secured to her by the First Amendment in assuring freedom in the area of intimate association and access to the courts.

79. Doerr is acting in his individual capacity but has abused his power and authority as the final administrator of the Court of Common Pleas of Butler County to cause injury to Doe. In this regard, he has acted under the color of state law.

## COUNT III

### Doe v. Holman and Ritson

**Claim under 42 USC Section 1983- -Violation of the Equal Protection and Procedural Due Process Clause of the Fourteenth Amendment and the Rights Guarantied under the First Amendment to the Constitution including the Right to Engage in Expressive Activity and to have Access to Courts or Petition the Government as well as Right to not associate with Doerr in an Intimate Fashion as Guarantied by the First Amendment**

80. The preceding paragraphs are incorporated herein as if set forth in full.

81. Over the course of Doe's tenure with the Probation Office, Holman and Ritson have retaliated against Doe as a result of knowing that she had the intimate relationship with Judge Doerr.

82. They have singled her out, treated her differently, and isolated her from working with other probation officers.

83. Holman and Ritson have borne a grudge against Doe because they knew or suspected her intimate relationship with Judge Doerr.

84. They have also worked in concert with Doerr to deny Doe basic rights and privileges of her employment, contrived to isolate Doe from her fellow probation officers, deny her the same benefits and opportunities offered other probation officers and impose different rules of conduct on Doe, because of her prior relationship with Judge Doerr, and because she has engaged in protected first amendment activity.

85. Holman was involved with Doerr in manufacturing false evidence for the purpose of depriving Doe of access to the courts and to retaliate against her for engaging in First Amendment activity.

86. Holman and Ritson have purposefully engaged in offensive conduct to punish Doe for engaging in activity protected by the First Amendment.

87. This conduct violates Doe's rights to equal protection of the law under the Fourteenth Amendment to the United States Constitution, and hence Doe may maintain this action under 42 U.S.C. § 1983 against Holman and Ritson.

88. Doe requests this Court assume jurisdiction over this Count and award her all damages available to her under 42 U.S.C. § 1983.

**INJURIES**

89. The conduct of the Defendants has injured Doe in multiple ways. She has lost income and the opportunity to advance in her career and develop the full extent of her capacities and garner experience as a probation officer, she has suffered great emotional injury, loss of reputation and other personal injuries.

**RELIEF**

Wherefore Doe requests this Court assume jurisdiction over this matter and provide her with all of the relief that is just and appropriate, including compensatory damages, injunctive relief, punitive damages, counsel fees and the costs of this action.

Respectfully submitted,

By:   /s/ Edward A. Olds

Edward A. Olds, Esquire
PA ID #23601
OLDS RUSS
1007 Mount Royal Boulevard
Pittsburgh, PA 15223
Phone (412) 492-8975

*ATTORNEY FOR PLAINTIFF*