IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CRYSTAL STARNES, | Case No: 2:17-CV-01304-CB |
| Plaintiff, | |
| v. | |
| COURT OF COMMON PLEAS OF BUTLER COUNTY, 50th JUDICIAL DISTRICT; THOMAS DOERR, individually; and THOMAS HOLMAN, individually; | |
| Defendants. | **JURY TRIAL DEMANDED** |

## SECOND AMENDED COMPLAINT
### FILED PURSUANT TO ORDER OF COURT, DOCKET NO. 19

Plaintiff, Crystal Starnes, by and through her attorney, Edward A. Olds, Esq., and Olds Russ Marquette & Peace, hereby files the following Second Amended Complaint against Defendants as captioned above.

## I. JURISDICTION AND VENUE

1. This Court has jurisdiction over this matter by virtue of 28 U.S.C. §1331 and 42 U.S.C. § 2000e.  Plaintiff brings a discrimination action and a civil rights action against the Defendants arising out of their discriminatory and retaliatory treatment of her.

## II. PARTIES[1]

2. Plaintiff, Crystal Starnes, is an adult individual who resides in Butler County, Western District of Pennsylvania.

3. Defendant, Court of Common Pleas of Butler County, 50th Judicial District, (Court) is part of the Pennsylvania Unified Judicial System.

---

[1] The Defendant, Douglas Ritson, has been dropped, and no claim is asserted against him in this Second Amended Complaint.

4.  Defendant, Thomas Doerr, is and has been a sitting judge on the Court of Common Pleas of Butler County for over 25 years.  As such, Doerr's status is governed solely by the provisions of Article V of the Pennsylvania Constitution.

5.  Doerr has been elected by his peers to serve as the President Judge of the Court of Common Pleas of Butler County.  In this capacity, he has administrative duties over the manner in which the Court of Common Pleas operates on a day-to-day basis, including, among other matters, the overall supervision of the staff of the Butler County Probation Office.

6.  At all times relevant to this action, Doerr acted under color of state law, for actions he took by virtue of his possessing the administrative authority over the employment practices of the Court of Common Pleas of Butler County, including over the Court's Probation Office.  Doerr is also sued in his individual capacity.

7.  Defendant, Thomas Holman, is the Deputy Court Administrator of the Court of Common Pleas of Butler County, and has supervisory authority over the Probation Office and the Domestic Relations Office of the Court of Common Pleas of Butler County.  At all times relevant, Holman acted under color of state law.

8.  The claims brought by Plaintiff arise out of acts committed by the individual Defendants in the course performing their administrative duties to the Court.

### III. FACTS

9.  Plaintiff works as a Probation Officer for the Court of Common Pleas of Butler County. She has worked for the Court since August 2005.

10. Plaintiff met Thomas Doerr at a Christmas party at the house of the Chief Public Defender for Butler County in December 2004.

11. At the time, Plaintiff was working in the Probation Office for the Court of Common Pleas of Allegheny County.  However, she was a life-long Butler resident and was interested in returning to Butler.

12. At the Christmas party, she met Doerr and the two discussed their views and ideas concerning probation and the rehabilitation of offenders.   At that time, Doerr, as President Judge of the Court of Common Pleas of Butler County, had supervisory and ultimate authority over the operation of the Court.   Included within this authority would be the authority to either hire or recommend hiring probation officers.

13. Although they had discussed their views of probation work, and Doerr suggested that he thought Plaintiff had a sound view of the purposes of probation, he had other matters on his mind, as well.   Doerr engaged in flirtatious behavior.   He told Plaintiff that he thought she was very attractive and suggested that they should stay in touch. Thus, Doerr expressed an interest in establishing a social relationship with Plaintiff that night.   He shared his cell phone number, induced Plaintiff to give him her cell phone number and suggested that they maintain contact.

14. In fact, Doerr was interested in establishing a sexual relationship with Plaintiff.   He thereafter called her cell phone a number of times, always insisting that they meet.   He repeatedly invited her to visit him or meet him at his chambers. At first, Plaintiff put him off and looked for excuses not to meet with him.

15. Doerr eventually convinced Plaintiff to come to his chambers late on a Friday evening in February 2005.  Plaintiff had undergone an endoscopy that particular morning, during which procedure she was given anesthesia. She was told not to drive and that the effects of the medication could persist throughout the day.

16. Nevertheless, Doerr reassured her that she could drive and insistently summoned her to visit with him. She succumbed and agreed to meet Doerr. Doerr was waiting outside the darkened courthouse when she arrived, and he let her in a side door. They were alone in the courthouse that evening. Doerr escorted Plaintiff to his chambers, showed her his darkened courtroom, and began kissing her and cajoling her to engage in intercourse with him. Plaintiff had not come to Doerr's chambers expecting him to insist on intercourse. She was surprised by his actions, but she was overwhelmed by the situation, and allowed him to engage in sexual intercourse with her on the chambers' floor, even though the sexual intercourse was not welcome. The encounter was not romantic, nor was Plaintiff avid about engaging in sexual intercourse. Doerr placed her in an awkward position, which caused Plaintiff significant discomfort. Nevertheless, Plaintiff did not stop Doerr from penetrating her and having consummation. When the intercourse was over, she was shaking and feeling pain. That evening Doerr stated that it would be a "business" relationship, and advised Plaintiff not to develop any attraction for him. Plaintiff left the courthouse bewildered and in shock.

17. The prospect that Plaintiff would be hired to serve as a probation officer in Butler County was implicit that night, and in fact, discussed that evening. Doerr suggested that he would do what he could to help Plaintiff get a job with the probation office.

18. In fact, over the next several months, Doerr and the Court administrator at the time, Michael Noyes, maintained contact with Plaintiff about a position as a Court probation officer. Plaintiff did not engage in any further sexual activity with Doerr before she was hired.

19. A vacancy in the probation office occurred later in the summer.   Doerr took complete control of the hiring process and ensured Plaintiff was hired.  Plaintiff was given the position and sworn in as a probation officer in August 2005.  She was assigned to adult probation.

20. Doerr was the judge who presided over Juvenile Court.  He urged Plaintiff to take a probation position in the Juvenile Division.  She, however, only wanted to supervise adults.

21. Once she began her work for the Butler County Court of Common Pleas, Doerr began again, to summon her to his chambers for sexual relations.  Plaintiff felt that she had little choice and did not resist his command.  After all, he was her boss. The sexual relations resumed, and there were a number of instances over the next four years when Plaintiff would be summoned by Doerr to come to his office, during the day or after hours or on weekends, for the purpose of sexual relations.

22. Doerr was in complete command of the affair.  Plaintiff never initiated any intimate relations, nor did she welcome it. Plaintiff would come to Doerr's chambers when commanded by him, because of his position of power over her.  Her involvement was entirely passive.  The relationship had a profound impact on Plaintiff's life.  Until this day, she cannot see Doerr without feeling anxious, used and ashamed.   She continued to worry about his power over her job until his supervisory control over her was ended, which was after this case was filed.

23. Doerr insisted that he and Plaintiff talk on the phone constantly.  He would call her daily or expect her to call him.  He would often talk of sex in these calls.  He often shared

pornography with her.  He would email it, and show it to her when he summoned her to his chambers.  This activity was not welcomed by Plaintiff.

24. As noted, the sexual relations between Doerr and Plaintiff continued for approximately four years after she was hired.  The instances of sexual encounters dwindled over time. There was never romance in the affair.  The best that can be said from Plaintiff's perspective is that she tolerated the unwelcome sexual encounters. She felt that she had no choice, given the power disparity.  Therefore, she succumbed. The sexual relations continued, in the words of Doerr, to be a business transaction and brought Plaintiff no joy or satisfaction.

25. But during this entire time, and indeed after the sexual relations ended, Doerr also used Plaintiff for other purposes.  He would repeatedly summon her to his chambers to learn about the day-to-day interactions of the probation office.  He would make Plaintiff share the humdrum gossip of office conflicts and interactions as well as the overall conduct in the probation office. This aspect of their relationship persisted after the sexual relations, ended.  It was part and parcel of Doerr's control and manipulation of Plaintiff.

26. On one occasion, in 2010, well after the last instance of sexual relations, Doerr telephoned Plaintiff and told her he had been on the bench, and asked her to transmit a video of herself masturbating.  The request signifies Doerr's continuing interest and belief that he could subjugate Plaintiff to do his bidding.  The request sickened Plaintiff, and she declined to film herself, but found a pornographic show on cable television, which she transmitted to him.

27. During this time period, there was widespread sharing of pornography among Court employees, including Doerr. At some point, Doerr directed that the email archives be deleted.

28. Even after the sexual encounters ceased, Doerr continued his social and work place domination of Plaintiff, using his past relationship to attempt to continue his control over her. Hence, the consequences of the affair have persisted to this day. Doerr has exerted influence in multiple aspects of Plaintiff's work-life and made certain that Plaintiff continues to feel his power over her life.

29. The manner of Plaintiff's hiring marked her for unusual and distinctive treatment by others in the probation offices. Many of the Court employees in the Probation Office viewed Doerr's hiring of Plaintiff suspiciously. Doerr's actions and the fact that Plaintiff had access to Doerr outside the typical lines of authority and reporting caused the Court's leadership, including Defendant Holman, to develop resentment and antipathy towards Plaintiff.

30. Consequently, Holman, was always on edge when it came to Plaintiff and treated her differently. His attitude manifested itself in petty matters, but due to the persistence of the negative attitude, the treatment caused Plaintiff great stress.

31. Because Plaintiff had no particular interest in maintaining any relationship with Doerr, he forced Plaintiff to continue interacting with him. For instance, for the last five years he has assigned her to duties that require her to appear in his court. Doerr has insisted that they display "normal" social interaction, and puts on a show when she appears in his courtroom on cases that she must handle. His attitude is overtly patronizing and flirtatious.

32. Doerr felt it necessary to continue to control Plaintiff to make sure she never revealed their relationship. For instance, he encouraged Plaintiff to engage with his wife in a sideline, selling Silpada Jewelry at parties, and thus compromise her independence.

33. In 2010, Plaintiff started dating her current husband, who was also a Probation Officer. After Plaintiff began this relationship with her current husband, Doerr became antagonistic.  On one occasion he ran into Plaintiff and her future husband at a Lowes store, and remarked that he hoped they were off the clock.  In fact, they were.  But he was clearly upset by their being together.  Doerr would continue to manifest instances of jealousy through 2017.  The tensions emanating from Doerr contributed to problems Plaintiff faced in the work place.

34. Plaintiff eventually married her current husband, and both of them were subjected to harassment at the hands of the Court's administration under the direction or acquiescence of Doerr.  Plaintiff's current husband had worked at the Probation Office for over twenty years prior to marrying Plaintiff, and the fact that he became a target of harassment is indicative of the hostile atmosphere that existed for Plaintiff, which has shadowed her career at the Court, and continues to the present.  The hostile conduct directed towards Plaintiff's husband caused him to develop anxiety and seek time off from work.  He eventually retired after an extended paid leave.  The hostility was supervised and approved by Doerr.

35. Plaintiff became pregnant in 2012, and developed heightened risks factors that were known to both Doerr and the Court administration.  She had to leave work early in the pregnancy, because of a situation that almost resulted in a miscarriage.  She continued to have problems throughout the pregnancy.   Her job had been supervising

probationers at the time of their reentry. Doerr would require her to write reentry plans for litigants who were in contempt, to ensure she would have to appear before him.  However, about 4-6 weeks before she was scheduled to go on leave to deliver, her caseload was given to another officer and she was reassigned to a general caseload, supervising 190 probationers.

36. Plaintiff's reassignment was punitive and made effective on the eve of her pregnancy leave.  She was told that judges were unhappy with her use of a standardized order, although no judge had ever complained or suggested that Plaintiff use a different order. Moreover, this allegation conflicted with what Doerr had told Plaintiff - - that her performance was viewed as excellent by the other judges.

37. Plaintiff began her pregnancy leave in September 2012.  While on leave, she was advised that when she returned, she would be reassigned once again, this time, moving from Adult Probation to Juvenile Probation. Doerr still handled juvenile cases.  The most obvious consequence of this move was that Plaintiff would be required to appear in Doerr's courtroom more frequently.  He was thus able to force her to be in his presence, again.  A new position was actually created - - the Placement Officer position - - which would also require extensive travel, visiting juveniles in placement throughout the Commonwealth.

38. The reassignment to the Juvenile section was imposed over Plaintiff's objections. Plaintiff was anxious about being compelled to have frequent contact with Doerr.

39. The extensive travel required of the position was also very difficult for Plaintiff, given the fact that she had a new infant, who had health problems associated with a heart malfunction.   Plaintiff questioned Doerr about the move to juvenile probation, and he

told her it was meant to get her out of the adult probation "hornet's nest" and to move her closer to him.

40. By virtue of Plaintiff's new assignment to Juvenile Court, Doerr was able to essentially force frequent interaction between him and Plaintiff, as she had to appear in his courtroom.  Each time she appeared in his courtroom, he singled her out, looking her over, making her feel uncomfortable and forcing her to have social relations with him. Plainitff had had enough of Doerr, and was not happy about his pretense at having a social relationship with her, which took the form of overly affectatious, unctuous greetings when he saw her in his courtroom, as exemplified by his loudly announcing her presence in court, or by coyly waving at her from behind his computer while he sat on the bench.  Doerr was either trying to reignite their relationship or emphasizing his power over her by these demonstrations.  It caused Plaintiff tremendous social and emotional agony and anxiety to have these frequent encounters with Doerr.

41. Plaintiff's work situation continued to be fraught with harassment, micromanagement, and interference with the way she performed her job.  That hostility, coupled with the fact that her assignment to Juvenile Division required her to maintain contact with Doerr, prompted her to decide in early 2014 that she simply could not continue working in the probation office.  She talked to Doerr about her decision and he arranged to have her transferred the Butler County Domestic Relations Office.

42. This move involved a significant pay reduction - - $12,000 per year - - and Plaintiff quickly regretted leaving her position in probation.  She rethought the decision that led to her giving up her probation position, and, in a matter of a few days, advised the administration that she wished to return to the Probation Office.

43. This should have been a simple process.  Butler County personnel policies allow for an employee to return to their former position, if they elect to do so, within 30 days.  Thus, Plaintiff believed that she could return to the probation office as a matter of right, since she made her decision within that time frame.

44. However, Doerr and Holman stymied her return.  She met with Holman, and he told her that Doerr in particular would not allow her to return.  "The marriage was over," according to Holman, and she would  "have to sue the Judge" to get her old job back.  Plaintiff happened to encounter Doerr in a stairwell of the courthouse at this time and he held her hand, while she discussed her desire to return to her probation officer position.  As he held her hand, he explained he would try to help her.  Plaintiff interpreted Doerr's move as an effort to reignite the sexual relations, which was highly offensive and unwelcome to Plaintiff.

45. In the end, Doerr contrived to use Plaintiff's desire to return to her former position as a pretext to secure a purported release from Plaintiff.  This purported release was Doeer's attempt to foreclose any action against him.

46. Doerr enlisted the resources of the Administrative Office of the Pennsylvania Courts (AOPC) to represent the interest of the Court in securing the release, without advising the APOC of his previous sexual relations with Plaintiff or his misconduct in office.  In essence, he contrived a dispute, surrounding whether Starnes could return to her former position, with the goal of securing a release that would potentially exonerate him personally.  He would permit Plaintiff to have her job, but he insisted that before Plaintiff could return to a Probation Office position, she would have to sign what was styled as a general release.

47. Starnes had counsel who communicated with the AOPC counsel.  But negotiations proceeded on two fronts.  During the course of negotiations, a mutual acquaintance of Plaintiff and Doerr, who was also an employee of Butler County, contacted Plaintiff and asked Plaintiff to lunch on several occasions. This person was Doerr's personal emissary. On one of the occasions, this individual outlined the terms suitable to Doerr and warned Plaintiff that Doerr was his man, and that he would "kill her" if she disclosed her relationship with Doerr.

48. Plaintiff did not know how to take the comment, not believing that the acquaintance actually would carry through with violence, but she was highly upset and had to call her husband immediately after the encounter to talk to him about it.  She was put at great unease by virtue of the conversation.

49. The release was ostensibly assembled. The AOPC counsel put together a release/waiver that would allow Plaintiff to return to the probation office, but only on the condition that she forsake claims against the Court of Common Pleas. The terms were set by Doerr.

50. While it was Doerr's design to secure a release from Plaintiff covering his improper conduct, this goal was not accomplished.  The language of the release is actually ambiguous as to the question of whether Doerr is covered or whether Doerr's sexual harassment of Plaintiff is covered.   No mention is made of Doerr in the release.  The absence of any explicit reference to Doerr is like because, if Doer had he insisted on such language, his secret effort to conceal his own culpability and misconduct would have had to have been explained, or at least disclosed.

51. In addition, Doerr's constitutional status as a judge distinguishes him from the run of the mill employee or agent of the Courts.  He is an elected figure, whose status in the pubic system is a matter of constitutional dimensions.  He is not "supervised" by the AOPC, as a typical employee might be, and he has a separate constitutional status from the Court itself. The entity that presides over judicial conduct is the Judicial Conduct Board.  There is no language in the release that covers the waiver of claims against a "Judge."

52. Moreover, enforcement of such a release /waiver under the circumstances of the case would violate public policy.  Doerr interfered with Plaintiff's effort to return to her probation officer job, in the hopes that he could sneak a wavier covering his own improper conduct into the mix.  This became apparent by the negotiations conducted by his personal intermediary, who handled negotiations with Plaintiff, personally.  It was in these secret dealings that the "deal" was purportedly sealed. Hence, in the course of preventing Plaintiff from exercising a non-controversial return to her former employment, Doerr attempted to leverage his own power and control in a secretive fashion, while ostensibly using the resources of the state, to secure a personal advantage.

53. As it turns out, the language of the release/waiver does not cover Doerr or the conduct that makes him liable to Plaintiff, now.  As will be described, there was also a failure of consideration.

54. Plaintiff's counsel executed the release, not Plaintiff.  She was not provided with an executed copy of the release.  Plaintiff returned to the Probation Office in May 2014. The release had assurances that Plaintiff would be treated similarly to other probation

officers, a promise that was not kept.   In fact, the harassment and hostile work environment resumed.  It did not skip a beat.

55. Plaintiff was placed as a Probation Officer in Domestic Relations, responsible for probation issues in family court.  In the past, this function had been staffed by males, who not only supervised defendants who had pled guilty to indirect criminal contempt, because they had violated PFA orders, but also defendants convicted of other domestic violence offenses, such as simple assault.  This position therefore fell under the gambit of adult probation.  Once Plaintiff was placed into the position, however, her expense reimbursements continued to come from the juvenile probation account, as if she was still slotted as a juvenile probation officer.  Juvenile Probation has been short an officer for the past four years.

56. From the outset of her placement in the domestic relations position, Plaintiff was isolated, ostracized and treated differently.  She was denied her own office, and instead was forced to work in an open area.  This working arrangement was inappropriate, as Plaintiff was handling confidential matters.  Although placed in an open space, Plaintiff was physically isolated from other probation officers.   Emails of general circulation were not provided to her.  She was treated as a second-class citizen when it came to training opportunities, even though she is relatively high on the seniority list.  She was given a different allotment of uniforms, and a variety of other instances of dissimilar treatment occurred.  Her direct supervisor is not a probation officer, and has essentially no experience in dealing with people on probation.  Starnes has been fingerprinted multiple times, without explanation.

57. Plaintiff was also restricted in terms of performing her probation duties and prohibited from conducting field visits of her probation reports. The other probation officer in the Domestic Relations Officer is a male who is permitted to go in the field to supervise his probationers and earn overtime or comp time. Plaintiff is not. The male Domestic Relations Officer attends supervisors' meetings. Plaintiff does not.

58. This differential treatment all stems from Plaintiff's prior relationship with Doerr, demonstrating that the discrimination has continually persisted from the sexual relations between the two. The harassment and hostile work environment of Plaintiff persisted through 2014 and 2015.

59. Plaintiff began an investigation to substantiate her belief that she was being unfairly singled out, and, as a result, presented a number of right to know requests to determine which probation officers were being awarded overtime.

60. At the end of 2015, Plaintiff submitted her application for on-call duty. On-call duty is the opportunity to be on call 24/7 for a one-week period to handle urgent or emergency matters that occur during off-hours. Her application was rejected.

61. The rejection of her effort to volunteer for on-call duty, along with the information that Plaintiff had learned by submitting right to know requests, prompted Plaintiff to decide that she was a subject of discrimination and retaliation.

62. Plaintiff decided to contact the Equal Employment Opportunity Commission and indicate her intent to file a Charge of Discrimination in February 2016.

63. Plaintiff advised her supervisors of her intent to the file the charge at the end of February 2016.

64. Within days, Plaintiff was placed on a Performance Improvement Plan.   Plaintiff's supervisors told her that Doerr and Holman were behind the move.   The performance plan was absurd, focusing on picayune issues. This performance plan was in retaliation for Plaintiff having contacted the EEOC, as Plaintiff had received a good evaluation at the end of January 2016, hardly a month before being placed on the improvement plan. No performance problems were noted in that evaluation.

65. After Plaintiff notified the Court that she had filed an EEOC complaint, Holman and Doerr attempted to subvert her discrimination claims.   They concocted a policy that purported to preclude probation officers assigned to the Domestic Relations Office from being eligible for on-call duty.   They backdated the policy to make it appear that it had been in existence since 2013.  It had not.  It was a fabrication, that was presented to the EEOC in the hopes of defeating Plaintiff's claims.

66. Thus, the "policy" document was fabricated and clumsily backdated and made to appear as if it had been in effect since 2013.   In fact, there had been no such policy that predated Plaintiff's filing with the EEOC.   The employee handbook issued in 2013 ineluctably attests to this fact.

67. The intent of Holman and Doerr in concocting the faux policy and creating, what is in essence false evidence, was to retroactively attempt to justify the refusal to permit Plaintiff to do on-call duty.   They wanted to have some "legitimate" reason for the Court's actions.

68. Holman and Doerr specifically sought to deny Plaintiff equal protection of law and procedural due process in crafting the policy.

69. Plaintiff has continued to be singled out and treated differently, even after she presented her claim to the EEOC. She is still not on the general email list for probation officers. She continued to be prohibited from performing fieldwork, and even now, when she does, the administration designates her a partner(s), who are invariably a male. In fact, two males from Adult Probation are always scheduled to accompany Plaintiff when she goes out into the field. The other PO in the Domestic Relations Unit may choose his partner, and make house calls on probationers in the evening, which involves overtime. Plaintiff is prohibited from working any overtime.

70. Doerr has continued to demonstrate his jealousy. On several occasions, he interrupted Plaintiff while she was talking to male staff, including other professionals, in the hallway. He later chided Plaintiff about one of these incidents. In 2017, he attempted to assign her duties outside of the chain of command, which would involve the potential for contact between them.

71. There has never been a respite for Plaintiff - - from the time she terminated her relationship with Doerr until the present - - from the unwanted attention, attempts to control, and the menace of Doerr. Plaintiff must face each day, not knowing what Doerr will do. His manipulation of her feelings and emotions constitutes an ongoing, continuing quid pro quo hostile work environment.

## CAUSES OF ACTION

### COUNT I

### Starnes v. Court of Common Pleas of Butler County

### Claim Under Title VII; 42 U.S.C. §2000(e)

72. The preceding paragraphs are incorporated herein as if set forth in full.

73. Plaintiff filed charges of discrimination and provided information to the Equal Opportunity Commission ("EEOC") in a timely fashion.

74. In her charge, Plaintiff related the manner in which she had been subject to discrimination by the management of the Court of Common Pleas of Butler County, including Holman, Ritson and Doerr. She also advised the EEOC of the relationship that existed between her and Doerr.

75. Starnes was victim of discrimination, both in the terms and conditions of her employment and as a result of the hostile work environment created by Doerr and the Court's administration. Doerr's pursuit of Plaintiff, and his persistent and continuous efforts to control and mold the work experience of the Plaintiff was unwelcome, subjectively offensive to Plaintiff and objectively intolerable. It was regular and pervasive. Throughout the entire course of Plaintiff's employment, Doerr created and perpetuated a hostile atmosphere and work environment for Plaintiff. Even after the sexual relations ended, Doerr continued to harass, embarrass and control Plaintiff's employment through a variety of devices and artifices. For the last seven years, he has continually inserted himself into Plaintiff's life, either for the purpose of rekindling the affair or to demonstrate his control and power over her.

76. After Plaintiff executed the purported release, the discrimination and harassment took different forms and manifestations, but theses new forms were part and parcel of the same harassment and hostile work environment that existed from the start of Plaintiff's work experience with the Butler County Court of Common Pleas.

77. Plaintiff has satisfied all of the procedural and administrative requisites for maintaining this action against the Court.

78. Plaintiff has provided the EEOC with additional information over time, setting forth the basis for her belief that she is a victim of a hostile work environment, quid pro quo discrimination, gender discrimination and retaliation.

79. The EEOC has issued a Right To Sue Letter and Plaintiff has filed this timely Complaint in accordance with her rights.

80. As a result of the conduct of the Defendant Court of Common Pleas of Butler County and its agents, Plaintiff suffered both personal and financial injury. She has experienced shame, embarrassment, humiliation, stress, anxiety and PTSD. Her professional life has been greatly diminished.

81. Plaintiff requests this Court assume jurisdiction over this matter, and adjudicate her rights under Title VII.

## COUNT II

### Starnes v. Doerr

### Claim under 42 USC Section 1983- -Violation of the Equal Protection Clause of the Fourteenth Amendment, as well as Right to not associate with Doerr in an Intimate Fashion as Guarantied by the First Amendment

82. The preceding paragraphs are incorporated herein as if set forth in full.

83. From the instant that he met her in February 2005, until the time that this action was commenced, Doerr discriminated against Plaintiff on the basis of her sex.

84. First, Doerr used his position as President Judge to the Butler County courts to compel the Plaintiff to engage in unwelcome sexual activity.

85. Thereafter, he compelled the Plaintiff to continue in a relationship, which required her to submit to his unwelcome sexual advances for over 4 years.

86. Doerr continued to plague Plaintiff in offensive and controlling ways, including giving her assignments that required her to appear before him in his courtroom, engaging in conduct which veered from the flirtatious to the ominous, with the purpose of either inviting Plaintiff to resume their relationship or threatening her well-being, by demonstrations of his power over her.  His conduct continued to be regular, persistent, pervasive and occurred repeatedly over the course of her employment.  This conduct persisted well into 2017.

87. Doerr has not treated similarly situated males in the same fashion.  He did not require such males to engage in sexual relations with him, nor did he flirt with them or control them on a personal level.

88. Although Plaintiff ended the sexual relationship with Doerr almost eight years ago, Doerr has continued to exert influence on Plaintiff's life.  He has attempted to control her and cajole her into maintaining a social or sexual relationship with him, in spite of her desire to end the relationship with him.

89. Over the course of years, Doerr has abused his power and authority over Plaintiff and has attempted to force friendship, companionship, and social interactions upon Plaintiff, which are offensive, unwelcome and unwanted, and which have caused her great injury.  He has insisted she appear in his court, so he could "look her over" and make her feel distressed and uncomfortable.

90. Doerr arranged to assign Plaintiff to positions that required her to be near him and to interact with him in manners that called to her mind the four years during which he compelled her to engage in sexual relations with him.  For instance, he caused the

transfer of Plaintiff to the Juvenile Division after she had her baby in 2012, so that she would be forced to appear in his courtroom and "be close to him."

91. By creating that propinquity, he placed himself in the position of looking at and watching her in ways that made her uncomfortable, attempting to extract social responses from her, calling her out when she appeared in his courtroom and continually reminding her of their past relationship, and his power over her life. Therefore, Plaintiff had to face him on a continual basis, feeling discomfort, pain, trepidation and fear and always being anxious that he would take steps to renew the unwelcome relationship.

92. Doerr surreptitiously manipulated the rules and policies of Butler County and the Court to coerce Plaintiff into providing a release that purportedly shielded him from any claims that she might have had against him, under the guise of negotiating her return to the Probation Office.

93. Doerr has insisted that Plaintiff maintain appearances of a professional/social relationship with him, and has continually forced Plaintiff to engage in social communication with him, even though that situation causes her great emotional pain and suffering.

94. Moreover, Doerr has set down rules, practices and procedures in the Court of Common Pleas of Butler County that have essentially prevented Plaintiff from exercising her professionalism and enjoying all of the benefits and rights she might have as a Probation Officer.   In essence, she has been a second-class probation officer from the beginning of her employment until the present, as he insisted on maintaining the sexual

relationship at the beginning and has substituted a highly patronizing control over her, since the sexual relations terminated.

95. Doerr's conduct has essentially been continuous, since the point when Plaintiff first had sexual relations with him until this action was commenced.

96. Doerr's actions have caused Plaintiff great embarrassment, humiliation, and other personal and emotional injuries.

97. As a result of the conduct of the Defendant, Plaintiff suffered both personal and financial injury.  She has experienced shame, embarrassment, humiliation, stress, anxiety and PTSD.  Her professional life has been greatly diminished.  She has suffered a loss of future economic opportunities, earnings and benefits. She has suffered severe emotional distress.

98. Doerr's treatment of Plaintiff has violated her rights under 42 U.S.C. § 1983, as it violates her rights under the Fourteenth Amendment to the United States Constitution to be free from unequal treatment at the hands of state officials based upon gender and has violated rights secured to her by the First Amendment in assuring freedom in the area of intimate association, because he has forced intimate association on her.

## COUNT III

## Starnes v. Doerr and Holman

## Claim under 42 USC Section 1983- -Violation of the Equal Protection Clause of the Fourteenth Amendment Gender Discrimination

99. The preceding paragraphs are incorporated herein as if set forth in full.

100.    From and after the time the Plaintiff executed the release, Doerr and Holman have discriminated against Plaintiff by creating a hostile work environment and by denying Plaintiff basic terms conditions and privileges of her employment.

101.    After Plaintiff executed the release, she was assigned to the Domestic Relations division of the Court, as a probation officer.  Since Doerr was the head of the family division as well as being the President Judge, he had ultimate supervisory power over Plaintiff in that position.  Holman supervised Starnes supervisors.

102.    Doerr and Holman punished and discriminated against Plaintiff by a variety of means that have been described in this Second Amended Complaint, which, when added together, created a hostile work environment.

103.    As a result of the conduct of the Defendants, Plaintiff suffered both personal and financial injury.   She has experienced shame, embarrassment, humiliation, stress, anxiety and PTSD.  Her professional life has been greatly diminished.  She has suffered a loss of future economic opportunities and earnings and benefits.  She has suffered great emotional distress.

104.    The treatment of Plaintiff by Doerr and Holman has violated her rights under 42 U.S.C. § 1983, as it violates her rights under the Fourteenth Amendment to the United States Constitution to be free from unequal treatment at the hands of state officials based upon gender.

## COUNT IV

### Starnes v. Doerr and Holman

### Claim under 42 USC Section 1983- - Violating the  First Amendment to the Constitution by Retaliation for Engaging in Protected Activity

105.    Doerr and Holman have purposefully engaged in retaliatory conduct to punish Plaintiff for engaging in activity protected by the First Amendment.

106.    Plaintiff volunteered for on-call duty in December of 2015.   Her request was promptly rejected.

107.    In January 2016, following the initial denial of Plaintiff's request to volunteer for on-call duty, Plaintiff sent a number of Right to Know requests to Butler County seeking information about overtime pay for probation officers and other matter that would elucidate the issue of favoritism in the Probation Office and potential gender discrimination.  Holman would have been the official to receive, review and supervise compliance with the Right to Know requests.

108.    Plaintiff also advised her supervisors that she intended to challenge her treatment by filing a charge of discrimination with the EEOC in February 2016.

109.    Thereafter, Doerr and Holman retaliated against Plaintiff.   Although she had received good job evaluations, she was placed on a performance improvement plan for pretextual reasons in March 2016.   This performance plan was implemented at the behest or instigation of Doerr and Holman.

110.    In placing Plaintiff on a performance plan, Doerr and Holman intended to retaliate against Plaintiff and make her fear that her job was in jeopardy.

111.    The purpose of this step was to discourage Plaintiff from engaging in protected activity.

112.    As a result of the conduct of the Defendants, Plaintiff suffered both personal and financial injury.   She has experienced shame, embarrassment, humiliation, stress, anxiety and PTSD.  Her professional life has been greatly diminished.  She has suffered a loss of future economic opportunities and future earnings and benefits. She has suffered extreme emotional distress.

113.    The treatment of Plaintiff by Doerr and Holman has violated her rights under 42 U.S.C. § 1983, as it violates her rights under the First Amendment to the Constitution of assuring her rights of expression and the right to petition the government.

## COUNT V

### Starnes v. Doerr and Holman

### Claim under 42 USC Section 1983- -Violation of the 14th Amendment, Procedural Due Process Clause

114.    One of the key allegations in Starnes' EEOC charge was that she was denied the opportunity to volunteer for on-call duty, an opportunity provided to all probation officers to qualify for extra pay and extra duties.

115.    After she filed her charge, Doerr and Holman attempted to fabricate evidence that would defeat a central tenet of her EEOC charge- - namely that domestic relations probation officers could volunteer for on-call duty.

116.    As described, they "manufactured" a purported "policy" in March or April of 2016, and manipulated the document to make it appear as if had been in effect since 2013. Doerr signed the policy document in 2016, but Doerr and Holman purposefully misdated the document, so that it would appear to have foreclosed Plaintiff's on-call application as a matter of Court policy, and not as matter of personal gender discrimination and retaliation.

117.   They crafted this document to defeat Plaintiff's EEOC claims.

118.   Doerr and Holman published the policy to all probation officers, in their attempt to validate its purported effect.

119.   Holman was involved with Doerr in manufacturing false evidence for the purpose of depriving Plaintiff of procedural due process as guaranteed by the 14th Amendment to the Constitution, and to retaliate against Plaintiff for engaging in First Amendment activity.

120.   This conduct violates Plaintiff's rights to procedural due process as guaranteed by the Fourteenth Amendment to the United States Constitution, and hence Plaintiff may maintain this action under 42 U.S.C. § 1983 against Holman and Doerr.

121.   As a result of the conduct of the Defendants, Plaintiff suffered both personal and financial injury.   She has experienced shame, embarrassment, humiliation, stress, anxiety and PTSD.  Her professional life has been greatly diminished.  She has suffered a loss of future economic opportunities, future earnings, and benefits.  She has suffered severe emotional distress.

## INJURIES

122.   The conduct of the Defendants has injured Plaintiff in multiple ways.  She has lost income and the opportunity to advance in her career and develop the full extent of her capacities and garner experience as a probation officer, she has suffered great emotional injury, loss of reputation and other personal injuries.

## RELIEF

Wherefore, Plaintiff requests this Court assume jurisdiction over this matter and provide her with all of the relief that is just and appropriate, including compensatory damages, injunctive relief, punitive damages, against the individual Defendants, counsel fees and the costs of this action.

Respectfully submitted,

By:     /s/ Edward A. Olds

Edward A. Olds, Esquire
PA ID #23601
OLDS RUSS
1007 Mount Royal Boulevard
Pittsburgh, PA 15223
Phone (412) 492-8975

*ATTORNEY FOR PLAINTIFF*